## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH SHADEL,** | : | **Civil No.  3:23-CV-1625** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security**[1] | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts,

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

On February 26, 2021, Kenneth Shadel filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning July 19, 2019. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Shadel could perform a range of light work and therefore had not met the exacting standard of disability set by law.

Shadel now appeals this decision, arguing that the ALJ erred in failing to declare him *per se* disabled at Step 3 of the sequential analysis which governs disability claims. In addition, Shadel argues that the ALJ's determination that he could perform light work was not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence

supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

### A. <u>Background</u>

This was Shadel's second disability application. His first application, which was submitted in February of 2018, was denied by an ALJ in July of 2019. (Tr. 80-94).

The administrative record of Shadel's second disability application reveals the following essential facts: On February 26, 2021, Kenneth Shadel filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning July 19, 2019. (Tr. 23). According to Shadel, he was completely disabled due to the combined effects of degenerative disc disease; right acoustic neuroma; polyneuropathy; hearing loss in the right ear without cochlear implant; anxiety; depression; and bipolar disorder. (Tr. 26). Shadel was born on May 6, 1973, and was 48 years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Tr. 40). He has a high school education and has past relevant work as a respiratory therapist. (Tr. 41).

## B. <u>The Clinical Record</u>

Shadel's appeal challenges aspects of the ALJ's determination concerning the severity of both his physical and emotional impairments. With regard to Shadel's physical impairments, the ALJ observed that:

> Claimant has a history of low back pain and degenerative disc disease and disc herniation in the lumbar spine with some spinal canal and foraminal stenosis and possible compression of the right L3 nerve root, the left L4 nerve root, and the bilateral L5 nerve roots (per MRI in 2018) (B3F). In July 2021, MRI of his cervical spine showed degenerative disc disease with annular bulging, canal stenosis and foraminal narrowing (B18F). MRI of the lumbar spine showed degenerative changes as well, with canal and foraminal narrowing. Additionally, at L3-L4 there was disc material abutting the ventral aspect of the exiting nerve (B18F).
>
> Claimant also has a history of mild bilateral sensorimotor polyneuropathy in the lower extremities per EMG in 2013. In 2018, he reported worsening pains, especially in the lower half of his body (B4F). In January 2021, it was noted that he had slowly progressive neuropathic pain (B8F/10). At that time, he presented with ongoing complaints, primarily related to his lower extremities, including joint pains, imbalance, and stiffness. He reported poor sleep pattern and issues with depression as well (Id.). His medications included Topamax, Tramadol, Mobic, baclofen, and tizanidine (B4F; B8F/10, 53, 63, 75, 81-82). Relatively recent neurology records show complaints of cramping and muscle stiffness (B19F).
>
> Besides these impairments, claimant has a history of right-sided acoustic neuroma, diagnosed in 2009. He did not have surgical/radiation treatment, and in 2018, imaging showed his neuroma had enlarged (B3F). He reported symptoms of occasional frontal headaches, hearing loss in the right ear, difficulty concentrating, and imbalance. An audiological evaluation in April 2018 showed moderate

4

to severe sensorineural hearing loss in the right ear with word recognition score of 92 percent in the right ear. Subsequently, an MRI showed vestibular schwannoma of the right internal auditory ear canal, similar to a prior study (B5F). In December 2018, claimant underwent frameless stereotactic radiosurgery for his neuroma, after which he reported some increased imbalance, improved but ongoing headaches, and stable hearing (B8F/70-72).

In July 2021, he was unable to hear finger rub or forced whisper, and audiogram showed mild sloping to moderately severe sensorineural hearing loss in the left ear and moderately severe to severe mixed hearing loss in the right ear (B13F). His speech reception threshold was 25 dB HL in the left ear and speech awareness threshold was 50 dB HL in the right ear (Id.). Word recognition scores revealed 96% at 65 dB HL in the left ear and 0% at 85 dB HL in the right ear (Id.). His responses for speech testing and pure tone testing were extremely delayed, mostly on the right (Id.). Test reliability was only fair to poor (Id.). Another July 2021 exam showed possible moderate sensorineural hearing loss in the left ear and possible severe to profound sensorineural hearing loss in the right ear, which also had poor word discrimination (B16F).

Several factors, however, suggest the claimant would be able to perform a limited range of light work. In November 2019, x-rays of the claimant's right knee showed only minimal degenerative changes in the medial compartment with mild osteophytic spurring without significant joint space narrowing (B8F/159). In November 2019, x-ray of the sacroiliac joints showed no evidence of sacroiliitis (B8F/161). July 2021 MRI of the claimant's cervical spine showed mostly mild findings and only moderate left foraminal narrowing at C5-C6 (his doctor indicated there was some "pinching" of the nerve at that level), while lumbar MRI showed primarily mild to moderate findings. The lumbar MRI did not mention nerve root compression as the previous MRI although it stated that at L3-L4, there was disc material abutting the ventral aspect of the exiting nerve (B18F/9-10). His doctor told him that his cervical MRI with some degenerative disc disease could occur with aging lifestyle such as lifting heavy objects on a regular basis, etc.

5

(B18F/10). His doctor told him that there was no need for surgery on his lumbar spine and only conservative treatment (physical therapy, pain management) was recommended (B18F/11).

In terms of neuropathy, EMG in 2020 showed no evidence of large fiber peripheral polyneuropathy, no trapped neuropathy, no radiculopathy or plexopathy, and no evidence of myelopathic process (B8F/10). Extensive lab work was without evidence of autoimmune, neuromuscular, or demyelinating disorder (Id.). Medication has also been helpful without evidence of significant adverse effects. In December 2020, it was noted that he took a combination of Mobic and Tramadol with good results and had no side effects (B8F/15). In October 2021, it was noted that Robaxin had been helpful (B19F/7).

As noted above, moreover, his polyneuropathy historically has been mild, and claimant's weakness during the adjudicatory period was characterized as mild as well, at least until mid-2021 (B8F/10, 23 (noting mild proximal distal weakness)). Despite tenderness, he had normal musculoskeletal range of motion, and despite allegations of decreased activities, he had normal muscle bulk and tone (B8F/12-13, 25, 43, 83). Records do not show tremors (Id.). At times, he has been able to rise from a chair without using his arms (B8F/26).

In May 2021, his doctor recommended using a cane as needed due to weakness of both lower extremities (B12F/9), and at the time the claimant's exam showed wide stance, reduced stride length, and hesitant gait (B12F/12F). However, I do not find it persuasive that the claimant requires an assistive device. The recommendation to use one, while somewhat supported by his abnormalities in gait, is not consistent with the record as a whole. Claimant did not report using an assistive device in his function report, he admitted at the hearing that he does not always use one despite his allegations of problems walking and with balance, and even when exams have shown gait abnormalities and weakness, they have not mentioned the use of an assistive device (B3E; B7F; B8F/13, 26, 43; B12F; B19F). On one occasion, he was very unsteady and used a wall to brace/balance, but he had no aids (B8F/55).

6

In addition to the factors noted above, several exams suggest the claimant had adequate musculoskeletal and neurological functioning to perform the exertional requirements of light work as well as occasional postural activities (except for no climbing ladders, ropes, or scaffolds). In February 2020, he had sensory abnormalities in the lower extremities but 4/5 strength in his lower extremities and otherwise 5/5 strength (B8F/43). His coordination was normal. His gait was wide stance with normal stride length, right and left arm swing. There was no ataxia (Id.). In a March 2021 exam, after the claimant was involved in a motor vehicle accident, he had paraspinous tenderness in the neck but normal range of motion of the neck, and normal strength against resistance in the neck (B7F/8). He had no midline tenderness or step-off with palpation in the upper back. He had normal motor function in his shoulder and upper and lower extremities. He had appropriate tactile sensation. His biceps and patellar reflexes were normal (Id.). In October 2021, he was in mild distress. He had wide-based gait, but no assistive device was noted. His sensation was intact, and his strength was still good at 4/5 in the upper and lower extremities (B19F/8).

In an October 2021 annual wellness exam, his BMI was 31.93, and he normal physical exam findings (e.g., normal heart rate and rhythm, normal pulses and heart sounds, normal pulmonary effort, soft and nontender abdomen, supple neck, warm and dry skin, and alert mental status) (B19F/9-13). Claimant reported no problems at this comprehensive physical exam (B19F/10). Although claimant reports significant problems using his upper extremities and significant manipulative limitations, these issues are not well-documented in physical examinations, and his activities (see below) suggest adequate use of his upper extremities.

Records also suggest the claimant can tolerate moderate noise levels, such as in an office. Claimant's acoustic neuroma has decreased in size. MRI in May 2020 showed stable, perhaps smaller mass/acoustic neuroma (B5F). A July 2021 MRI of the brain showed grossly stable lesion, but evaluation was limited by lack of intravenous contrast (B15F/14). Claimant's doctor reviewed it compared to a prior scan in November 2018 and indicated that the neuroma had clearly reduced in

size (B18F/7). It does not appear that he has had complications such as hydrocephalus, nor has he had recent surgical intervention since 2018/2019.

Claimant's tinnitus has improved. In January 2021, it was characterized as mild (B8F/8, 10). Per July 2021 otorhinolaryngological evaluation, his tinnitus was intermittent (B16F). Additionally, claimant could hear normal conversation without hearing aids (Id.). His voice was normal, fluent, and articulate (Id.). He had excellent speech discrimination in the left ear (Id.). In an October 2021 annual physical, his hearing was noted to be normal bilaterally (B19F/10).

Furthermore, despite his physical problems, claimant has been able to live alone, go out alone, and care for his personal needs (B3E; B16F/4; B21F/2). His weakness does not cause trouble driving (he reported his stiffness and pain did (B12F/10)), .(B3E; B16F/4).

Overall, claimant's imaging studies, physical examinations, course of treatment and response to treatment, and his activities suggest that he can perform light work with postural and environmental limitations. The record does not support use of an assistive device for ambulation or standing, and there is no persuasive evidence to support his complaints regarding reading and vision.

(Tr. 32-35).

With regard to his mental impairments, the clinical record showed that Shadel was treating his depression with medication and counseling and at times experienced unstable moods, but his mental status examinations were frequently unremarkable. As the ALJ explained:

As for his mental impairments and limitation, records document evidence of pain intertwined with mental health issues that would affect his ability to understand, remember, and carry out tasks and his ability

8

to stay on task throughout the workday. Claimant has a history of anxiety (e.g., generalized anxiety disorder), depression, and bipolar disorder (B6F, B10F, B11F). Pain affects his mood, which in turn affects his ability to concentrate/persist/maintain pace, and he has reported frequent suicidal ideations due to pain, although he said he would not act on it (B19F/7). In 2018, he reported low back and joint pains that caused him to be unable to work due to his discomfort (B4F/3). In a therapy exam in 2020, he demonstrated problems with concentrating as he was distractible and preoccupied with his health situation (B10F).

More recently, in early 2021, he reported multiple joint pains in his lower extremities, poor sleep patterns, and issues with depression (B8F/10-11). He was on Topamax, higher doses of which provoked side effects (B8F/11). In October 2021, he reported muscle stiffness and significant cramping that limited his daily activity and made him feel weak (B19F/6). His neurologist noted that his chronic pain fed into sleep problems (chronic insomnia) and depression (B19F/7). As noted below, a November 2021 therapy exam showed evidence of dysphoria and poor remote memory, suggesting issues with understanding, remembering, and applying information (B21F/7).

This evidence gives some support for the claimant's complaints of psychological issues, pain, and physical/mental fatigue and suggests the claimant is limited to performing simple routine tasks and making simple work-related decisions due to moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. In addition to the evidence cited above, the State agency consultant assessments further support these conclusions as they indicated the claimant could make simple decisions, follow short simple instructions, and understand, remember, and carry out simple 1-2 step tasks (B3A). On reconsideration, it was found he could perform "basic" routine tasks (B5A). To further account for the claimant's moderate limitations in concentrating, persisting, or maintaining pace, and his related inability to stay on task, I also find that he would be off task 10-12% of the workday due to his pain and fatigue.

The record does not support further restrictions. For example, in terms of treatment for mental limitations, the claimant has taken medication and has had some therapy, but his therapy has not been extensive, and he has had no psychiatric hospitalizations or crisis treatment (B6F, B17F, B21F, B24F). There is some evidence of noncompliance as well (B24F/3). Mental status exams have shown some abnormalities but generally suggest adequate cognition, social functioning, and adaptive functioning to perform the demands of the residual functional capacity.

In August 2019, the claimant had moderately depressed mood but normal appearance, behavior, and speech, appropriate affect, goal-directed thought process, unremarkable thought content, grossly intact cognition, and good insight and judgment (B6F/3). Neurology exam in 2021 showed intact recent and remote memory and normal attention and concentration (B12F/11). In March 2021, he was doing well, with stable mood, okay anxiety, and normal sleep and appetite. No medication side effects were noted. His mood was fair with appropriate affect, normal appearance and behavior, normal pitch and volume of speech, goal-directed thought processes, and no delusions, obsessions, or suicidal/homicidal ideation. Claimant's cognition was grossly intact, and his insight and judgment were good (B6F/4).

In July 2021, he was apathetic with dysphoric mood but had appropriate appearance and dress, unremarkable motor activity, normal speech, fair insight and judgment/impulse control, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status (B21F/1). In August 2021, he was doing quite well and had no major problems (B17F/5). His mood was ok, and his anxiety was stable. Mental status exam showed normal appearance, behavior, and speech, fair mood with appropriate affect, intact thought processes and cognition, good insight and judgment, and no suicidal or homicidal ideation (Id.).

In October 2021, he had no major problems. His mood and anxiety were stable, and his sleep was better on trazodone (B17F/4). His mental

status was normal with normal appearance, behavior, and speech, euthymic mood, appropriate affect, goal-directed thought processes, unremarkable thought content, grossly intact cognition, and good insight and judgment (Id.). In an annual physical in October 2021, his depression screening was negative (B19F/10).

A November 2021 therapy exam showed only dysphoric mood and poor remote memory (B21F/7). Otherwise, claimant had appropriate/normal mental status (Id.). A February 2022 exam was similar (B21F/9). Notably, claimant still had appropriate appearance and dress, unremarkable motor activity, appropriate behavior, normal speech, fair insight, good judgment/impulse control, good attention/concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status (Id.).

A January 2022 medication management note indicated that he was doing quite well (B24F/2). On exam, he had only slightly depressed mood and otherwise normal findings, including normal appearance, behavior, and speech, appropriate affect, goal-directed thought process, unremarkable thought content, grossly intact cognition, and good insight and judgment (Id.).

(Tr. 35-36).

## C. **Shadel's Self-Reported Activities of Daily Living**

In evaluating this disability claim, the ALJ also considered Shadel's activities

of daily living, noting that:

> Claimant's activities moreover have been at least simple and routine and suggest he can make simple decisions and interact with others appropriately. He has been able to live alone, care for his personal needs, talk on the phone with others and spend time with others in person, make frozen dinners and shakes, do laundry, drive, shop in stores, and pay bills, handle a savings account, and use

11

checkbook/money order (B3E; B16F/4). He has been able to handle his day-today routine at a slow pace due to pain but at a fast enough pace to get things done (B21F/6).

(Tr. 37).

### D. The Expert Opinion Evidence

Given this clinical picture, and Shadel's activities of daily living, four State agency consultants and a State agency medical consultant, Dr. Marielle Stone, opined regarding whether Shadel's impairments were disabling. These five experts reached somewhat differing conclusions but in broad terms agreed that Shadel could perform some tasks.

For example, with respect to his physical conditions, in August 2021, a State agency medical consultant, Dr. James Stephen Butcofski, found that Shadel could perform light work with 4 hours of standing/walking and about 6 hours of sitting. According to Dr. Butcofski, Shadel could lift 25 pounds and carry 10 pounds without difficulty; had the ability to push and pull all extremities with "slow and weak" limitations; could occasionally climb ramps/stairs but should never climb ladders/ropes/scaffolds; could occasionally balance; frequently stoop, occasionally kneel and crouch; but never crawl. Dr. Butcofski also considered Shadel's hearing impairments finding that he had limited hearing bilaterally with moderate difficulty with faint speaking and severe frequent difficulty with loud or amplified speech and

therefore should avoid even moderate exposure to noise, vibration, and hazards. (Tr. 117-32). In November 2021, a second State agency medical consultant, Dr. Catherine Smith, reached similar conclusions, finding that Shadel could perform light work with 2 hours of standing and/or walking and about 6 hours of sitting. According to Dr. Smith, Shadel could never repetitively push/pull/pedal and was limited in pushing and/or pulling with the upper and lower extremities beyond the amount for lifting and/or carrying; could occasionally climb ramps/stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. She found that Shadel should avoid even moderate exposure to noise. (Tr. 138-44).

Finally, in July 2021, an examining medical consultant, Dr. Marielle Stone, opined that Shadel could hear and understand simple oral instructions; could communicate simple information; and could use a telephone to communicate. She indicated he could tolerate exposure to quiet noise levels in the workplace. (Tr. 782-807).

As for Shadel's mental impairments, in April 2021, a State agency medical consultant, Anthony Galdieri, Ph.D., found that the plaintiff had mild limitation in understanding, remembering, or applying information; a moderate limitation in both interacting with others and in concentrating, persisting, or maintaining pace; a mild

limitation in adapting or managing oneself; and concluded that Shadel was able to make simple decisions and follow short simple directions using good judgment. (Tr. 106-16). On reconsideration in November 2021, a second State agency psychological consultant, John Chiampi, Ph.D., found that Shadel had mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others, concentrating, persisting, or maintaining pace, and in adapting. (Tr. 133-38). Dr. Chiampi also found that Shadel was markedly limited in the ability to understand, remember, and carry out detailed instructions but could perform basic routine tasks on schedule and had adequate social skills to perform basic tasks. (Id.)

Arrayed against this broad medical consensus were a few fragmentary pieces of treating source evidence. For example, in May 2021, his doctor recommended that Shadel use a cane as needed. (Tr. 728). Likewise, in 2019, rheumatology records indicated that Shadel was "disabled" but did not provide any further function-by-function analysis of his condition. (Tr. 462).

It was against this backdrop that Shadel's disability claim came to be heard by the ALJ.

### E. **The ALJ Decision**

On March 1, 2022, the ALJ conducted a hearing in Shadel's case, at which the plaintiff and a vocational expert testified. (Tr. 48-79). Following the hearing, on May 14, 2022, the ALJ issued a decision denying this claim. (Tr. 20-47). In that decision, the ALJ first concluded that Shadel met the insured requirements of the Act through December 31, 2021, and had not engaged in substantial gainful activity between July 19, 2019, the alleged onset date, and his date last insured. (Tr. 25). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Shadel had the following severe impairments: degenerative disc disease; right acoustic neuroma; polyneuropathy; hearing loss in the right ear without cochlear implant; anxiety; depression; and bipolar disorder. (Tr. 26).

At Step 3, the ALJ determined that Shadel did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. Shadel challenges this Step 3 determination on appeal. Therefore, it is appropriate to note that this aspect of the ALJ's decision was supported by the following detailed analysis:

> The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairments medically equal a listed impairment.

The claimant's degenerative disc disease does not satisfy the requirements to meet the musculoskeletal disorder listings of section 1.00, particularly Listings 1.15 and 1.16. The record does not show any of the following: a documented medical need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. In May 2021, the claimant's doctor discussed using a cane as needed due to weakness of both lower extremities (B12F/9). However exams generally do not mention the claimant using an assistive device even when he has gait abnormalities (B7F; B8F/13, 20, 26; B19F). Claimant does not always use a cane, and in his function report, he did not report using any assistive device, including cane, walker, crutches, or wheelchair (claimant hearing testimony, B3E). Claimant can also use his upper extremities for fine and gross movements. For example, claimant has been able to live alone, drive, bathe and dress himself, shop, do laundry, and make frozen dinners and shakes (B3E; B16F/4). Physical exams generally do not show significant dysfunction in the claimant's upper extremities to the extent that they would be of listings-level severity, although he has had puffiness in his wrists and fingers and tenderness in his upper extremities at times (e.g., B7F; B8F/11-13, 16-17, 22, 25- 26, 40, 49; B19F). Therefore, the claimant's degenerative disc disease is not of listings severity.

The claimant's neuroma and peripheral neuropathy do not satisfy the requirements of any listing, including listings 11.05 and 11.14. The record does not show disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the

upper extremities. The record also does not show marked limitation in physical functioning and in one of the following: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. Claimant can stand up from a seated position and maintain balance in a standing position without the help of another person or an assistive device such as a walker, two crutches, or two canes. He can use his arms to rise from a chair and rise from a chair without using his arms (B8F/26). There is no evidence that the claimant requires help from another person to maintain an upright position while standing or walking, nor is there evidence of use of assistive devices such as walker, two crutches, or two canes (see discussion above, for example). As noted above, moreover, the claimant can perform fine and gross movements with his upper extremities as suggested by his activities of daily living and physical examinations. Finally, the record does not show marked limitation in physical functioning as described in section 11.00G2-3. Claimant, for example, has been able to live alone, drive, do laundry, shop, and take care of his own personal needs (B3E; B16F/4 (July 2021 record indicating that he lived alone, could drive and do laundry, shopped twice a week, and could shower and bathe himself)).

The claimant's hearing loss in his right ear, which appears to be due to his acoustic neuroma, does not satisfy listing 2.10, as the record does not show an average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear. Additionally, the record does not show word recognition score of 40 percent or less in the better ear (see B13F, B16F).

Claimant has also reported balance problems and tinnitus, which like his hearing loss, seem to be due to his acoustic neuroma, but the record does not show that his impairments meet or medically equal listing 2.07 (e.g., B5F; B8F/10-13, 17-20, 23-26, 41-44, 52-55, 61-64; B16F).

The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listing 12.04 and 12.06. In making this finding, I have considered

17

whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant had a moderate limitation. Claimant reports brain fog and problems with cognition. Some relatively recent mental status exams show poor remote memory, but for the most part the claimant has had intact cognition and good or fair insight, suggesting that he can learn, recall, and use information to perform work activities (B6F, B17F, B21F, B24F). His activities suggest this as well as he has been able to live alone, drive, shop, and pay bills, handle a savings account, and use a checkbook/money order (B3E). He indicates that he can also make frozen dinners, which would require following instructions (Id.). Overall, no more than moderate limitation is shown.

In interacting with others, the claimant had a mild limitation. Claimant reports that he is not pleasant to be around and does not have a social life. However, he has also indicated that he spends time with others, both in person and on the phone (B3E). In July 2021, he indicated that he had a good friend who stopped in once in a while (B21F/2). Furthermore, he indicates that he can go out alone and shop in stores, suggesting adequate ability to interact with the public (B3E). Mental status exams also show evidence of appropriate appearance and dress, appropriate behavior, and normal speech, suggesting adequate ability to cooperate with and respond to others, and interact with others without excessive irritability, sensitivity, argumentativeness, or suspiciousness (B6F, B17F, B21F, B24F). He does not appear to have problems with paranoia (Id.). Overall, only mild limitation is shown.

Regarding concentrating, persisting or maintaining pace, the claimant had a moderate limitation. Claimant reports cognitive deficits, including difficulty concentrating, following instructions, and

completing tasks. He reports "fibro fog" (B3E) and physical and mental fatigue that could affect his ability to concentrate, stay on task, or maintain pace (claimant hearing testimony). Additionally, claimant's ability to concentrate, persist, and stay on task is limited by neuropathic pains, back pain from degenerative disc disease, arthralgias, and muscle cramping and stiffness (B4F; B8F/10; B19F). Therefore, he is likely to be off-task a certain percentage of the workday. However, the claimant is able to live alone, drive, shop, and pay bills, handle a savings account, and use a checkbook/money order (B3E). He is mostly able to handle a day-to-day routine (see e.g., B21F/6). Overall, only moderate limitation is shown.

As for adapting or managing oneself, the claimant had experienced a mild limitation. Claimant alleges difficulty dealing with stress and changes in routine. However, he has been able to manage with conservative outpatient mental health treatment. As noted above, exams show he has had appropriate appearance and dress, suggesting he can maintain personal hygiene and attire appropriate to a work setting. Additionally, exams show that he has good judgment, suggesting he can adapt to change, distinguish between acceptable and unacceptable work performance, and take appropriate precautions to avoid normal hazards (B6F, B17F, B21F, B24F). Finally, he has been able to live alone and handle his own needs, suggesting that he can set realistic goals and make plans independently of others (B3E, B16F/4; B21F/2). Overall, only mild limitation is shown in adapting or managing oneself.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

The paragraph C criteria are not established because the claimant has more than a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. As noted above, claimant has had only conservative outpatient mental health treatment, and mental status exams have been relatively stable. Furthermore, he has been able to live alone, go out alone, and manage his personal

needs. The record does not show that his adaptation to the requirements of daily life is fragile.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

Although not severe, I have considered the effects of obesity in making this finding as required by SSR 19-2p. Even considering obesity, I find that the claimant's impairments do not meet or medically equal any listing in any body system.

(Tr. 27-30).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Shadel's impairments as reflected in the medical record, and found that:

After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. He can never be exposed to unprotected heights, and he can only occasionally be around large moving mechanical parts. His exposure to weather, pulmonary irritants, and extreme hot or cold is limited to no more than frequently. His exposure to vibrations is limited to no more than occasionally. He would have moderate difficulty with either very low volume speaking or very loud speaking, so he would work best at a moderate noise level, such as in an office. He can perform simple and

20

routine tasks and can make simple work-related decisions in terms of using judgment and workplace stressors. He would be off-task 10-12% of the workday due to pain and fatigue.

(Tr. 30).

In fashioning this RFC, the ALJ considered the clinical evidence, medical opinions, and Shadel's activities of daily living. (Tr. 30-40). Further, in fashioning the RFC, the ALJ considered the medical opinions and prior administrative medical findings. As to the opinion evidence, the ALJ accepted the broad medical opinion consensus that Shadel could perform some work, finding those opinions to be partially persuasive to the extent that they were supported by the clinical record and Shadel's activities of daily living. (Tr. 37-40).

The ALJ also carefully detailed Shadel's clinical treatment history, noting that it was suggestive of some ability to perform work. (Tr. 30-37). In particular, the ALJ found that:

> Overall, claimant's imaging studies, physical examinations, course of treatment and response to treatment, and his activities suggest that he can perform light work with postural and environmental limitations. The record does not support use of an assistive device for ambulation or standing, and there is no persuasive evidence to support his complaints regarding reading and vision. Due to the issues identified above and the claimant's non-severe impairments, I find that the claimant is limited to light work.

(Tr. 35).

21

Further, the ALJ relied upon Shadel's activities of daily living, stating that:

> Furthermore, despite his physical problems, claimant has been able to live alone, go out alone, and care for his personal needs (B3E; B16F/4; B21F/2). His weakness does not cause trouble driving (he reported his stiffness and pain did (B12F/10)), and he can do laundry, shop, and shower, bathe, and dress himself (B3E; B16F/4).

(Tr. 34).

Having arrived at this RFC assessment, the ALJ concluded that Shadel could not perform his past work but could engage in other tasks that existed in substantial numbers in the national economy. (Tr. 40-42). Accordingly, the ALJ concluded that Shadel had not met the exacting standard necessary to secure Social Security benefits and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Shadel advances a twofold claim, arguing that the ALJ erred in failing to declare him *per se* disabled at Step 3 of the sequential analysis which governs disability claims and asserting that the ALJ's determination that he could perform light work was not supported by substantial evidence. This appeal is fully briefed and is, therefore, ripe, for resolution.

For the reasons set forth below, we will affirm the decision of the Commissioner.

III.   <u>**Discussion**</u>

A.   <u>**Substantial Evidence Review – the Role of this Court**</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id.</u> at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess</u> the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which

would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B.**      **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at \*7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

## C.    <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

As we noted at the outset, in this case the plaintiff devotes great energy on appeal to attacking the ALJ's Step 3 determinations. In our view, these arguments are unavailing when considered under the governing legal standards which define Step 3 analysis. The dichotomy between the Act's deferential standard of review and caselaw's requirement that ALJs sufficiently articulate their findings to permit

meaningful judicial review is particularly acute at Step 3 of this disability evaluation process. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

33

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function . . . is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the SLJ's Step 3 analysis. However,

when "the ALJ's conclusory statement [at Step 3] is . . . beyond meaningful judicial review," a remand is required to adequately articulate the reasons for rejecting the claim at this potentially outcome-determinative stage. <u>Burnett</u>, 220 F.3d at 119.

In this case, as we have discussed, the ALJ's Step 3 analysis was thorough, careful, and detailed. It addressed the pertinent listing criteria in detail and was supported by substantial evidence. Moreover, Shadel has not demonstrated that the evidence supported a finding that he clearly met *all* listing requirements, as he must do in order to prevail on a Step 3 claim. Therefore, the ALJ did not err in the Step 3 analysis of Shadel's claim.

Likewise, when we consider the ALJ's overall RFC assessment, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. We also acknowledge that an ALJ's mental RFC assessment does not have to follow any particular format and should be

upheld "as long as the ALJ offers a 'valid explanation,'" for that assessment. Hess
v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019).

Judged against these deferential standards of review, we find that substantial
evidence supported the decision by the ALJ that Shadel retained the residual
functional capacity to perform simple, routine repetitive work at the light exertional
level with the additional articulated limitations. Therefore, we will affirm this
decision.

This RFC determination was based, in part, upon those aspects of the medical
opinion consensus which the ALJ found persuasive. On this score, the ALJ adhered
to the paradigm shift in in the manner in which medical opinions are evaluated when
assessing Social Security claims. This new analytical model provides that "[t]he two
'most important factors for determining the persuasiveness of medical opinions are
consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain
how [he or she] considered the supportability and consistency factors' for a medical
opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c
(b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied
by an adequate, articulated rationale, examining these factors, it is the province and
the duty of the ALJ to choose which medical opinions and evidence deserve greater
weight. Moreover, "[t]he presence of evidence in the record that supports a contrary

conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." <u>Malloy v. Comm'r of Soc. Sec.</u>, 306 F. App'x 761, 764 (3d Cir. 2009). Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

Judged against these standards, substantial evidence supported this medical opinion evaluation which partially credited these medical opinions. Indeed, it is well settled that "[a]n ALJ is entitled generally to credit parts of an opinion without crediting the entire opinion . . . [and] an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions." <u>Durden</u>, 191 F.Supp.3d at 455, and "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington</u>, 174 F. App'x at 11.

Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

37

Here, these requirements have been met. On this score, we find that, while the plaintiff argues there was some evidence from which the ALJ could have drawn a contrary conclusion, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009).

So it is here. A review of the medical opinion evidence, the clinical treatment record, and Shadel's activities of daily living evidence provides substantial evidentiary support for the ALJ's decision. Thus, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that

substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>s/ Martin C. Carlson</u><br>Martin C. Carlson<br>United States Magistrate Judge

DATED: August 26, 2024